2024 IL App (1st) 230422-U

No. 1-23-0422

Filed May 9, 2024

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22600114101 |
| | ) | |
| BRIAN SMETANA, | ) | Honorable |
| | ) | Erin Haggerty Antonietti, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Justices Hoffman and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*: Battery conviction affirmed where the evidence was sufficient to disprove defendant's claim of self-defense.

¶ 2    Following a bench trial, Brian Smetana[1] was convicted of battery and sentenced to twelve months of supervision and 75 hours of community service. He appeals, arguing that the State failed to prove that his actions were not justified as self-defense. We affirm.[2]

---

[1]Every document in the record and the briefs spell the defendant's first name as Brian. At trial, the defendant spelled his first name as Bryan.

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 3                              I. BACKGROUND

¶ 4        Lewis Williams testified he was an employee of the Olympia Fields Country Club (Club) in Olympia Fields, Illinois. His duties were to provide security on the premises. On February 13, 2022, while stationed at the front gate, Williams received a radio transmission requesting him to come to the front desk of the clubhouse immediately. Williams proceeded to that location and observed Smetana sitting on the bottom of a coat rack in an office. Williams learned from Josh Korneta, another club employee, that there had been a "problem" in a ball room where an event was taking place that evening.

¶ 5        Both Korneta and Williams informed Smetana that Williams was a security guard. Williams approached Smetana and asked his name. Smetana "went off." He rose to his feet, approached Williams, and began yelling, "get out!" "[you aren't] anybody!" and "[you don't] have any business [here]!" Smetana also stated that he was a member of the Club and had just paid $6000. Williams asked Smetana to calm down and back off.

¶ 6        Williams went to retrieve a mask from a dispenser, as masks were required to be worn at the time due to the COVID-19 pandemic. Smetana followed Williams, continuing to yell and gesture at him. This continued for approximately 20 minutes. Smetana then attempted to re-enter the ball room. Williams stood in front of the doors and told him "no." Williams then went to the desk and asked Korneta to call the police.

¶ 7        Williams continued to "try to reason with" Smetana, but Smetana persisted in bumping into and "coming at" Williams, seemingly attempting to provoke Williams. A man attending an event taking place in one of the club's ballrooms came to the front desk and spoke with Korneta. Smetana attempted to approach the man, but Williams placed himself between them. The man returned to the ball room. Smetana continued to bump Williams, prompting Williams to extend his arm, saying

"step back." In response, Smetana "acted like [Williams had] pushed him real hard or something" and punched Williams. The two "scuffled" as Smetana continued to strike Williams. Korneta and Williams each called the police again. Smetana continued to attempt to strike Williams. Since Smetana would not comply with commands to stay back, Williams deployed pepper spray. Smetana retreated for a time, then came running at Williams "full force." Williams fell and Smetana threw punches. A woman attempted to intervene. Smetana slapped her and knocked her back. Eventually, Korneta succeeded in pulling Smetana away. Smetana then began fighting with Korneta. Williams deployed pepper spray again. Police officers arrived soon afterward.

¶ 8        During the interaction, Williams observed that Smetana was unsteady, his eyes were glassy, and he smelled of alcohol. Williams sustained a bruise on his forehead and bruising on his shoulder. He insisted that he did not make physical contact with Smetana first, but only fought back to defend himself once attacked. Williams authenticated surveillance video footage that depicted the altercation and narrated some portions that were published for the court.

¶ 9        On cross examination, Williams indicated that his attire did not display the word "security," or otherwise indicate that was his role. When Williams arrived at the front desk, he was not aware why Smetana was there, though he later learned that Smetana had been physically removed from the ball room. When asked about extending his arm, Williams explained, "I did not push him with that force. He was drunk, and at that point when I did touch him, he overplayed it as much as he could to make it look like he could so at that point he then attacked."

¶ 10       Joshua Korneta testified he was working at the front desk as the overnight guard for the hotel, which is also located at the Club, on February 13, 2022. Two events were taking place that evening in separate ballrooms. At some point, Smetana and another man exited one of the ballrooms and came to the desk. Smetana walked behind the desk while the other man explained

that Smetana had been kicked out for "what appeared to be drunken misconduct." Smetana began arguing with the man, prompting Korneta to call security. Smetana was "quite inebriated." His speech was slurred, he reeked of alcohol, and he was unresponsive to Korneta's and Williams's attempts to reason with him. Korneta called 911 as Smetana got more aggressive.

¶ 11       Williams pushed Smetana away as Smetana was "getting in his face." It escalated into a physical altercation. Williams deployed pepper spray when Smetana approached again. Smetana knocked Williams down and started beating him. At that point, Korneta intervened and pulled Smetana away. They fell to the ground and Smetana began beating Korneta. Williams deployed pepper spray a second time before police arrived.

¶ 12       On cross examination, Korneta recalled that when Smetana exited the ball room, he said he had been kicked out, but not that he had been hit.

¶ 13       Smetana testified in his own defense. He had been a member of the Club for several years before the February 13, 2022, Valentine's Day event he attended. At some point, he entered the room where a separate event was taking place, looking for a friend he had noticed earlier. Smetana did not locate his friend but began a conversation with someone else. Smetana was wearing jeans and a flannel shirt, while the attendees of the party in that room were more formally attired. A young woman, who "did not appreciate" Smetana being in the room, approached him. She "got really rude" with him and a man Smetana assumed was her husband approached. The husband struck Smetana in the head as another man approached. Smetana ran from the room to report the incident. He found Korneta and the front desk and related what happened in the ballroom. The men from the ballroom also came to the front desk. When Williams arrived, Smetana tried to explain but Williams "brushed [him] off" and spoke with the other men. Smetana told Korneta he wanted to make a complaint.

¶ 14       Smetana realized he had left his cell phone in the ballroom. He told Williams he wanted to retrieve it, but Williams would not allow him to do so. Smetana heard Korneta speaking on the phone requesting police to come. Smetana told Korneta he just wanted to file a complaint. He then decided to retrieve his cell phone. He told Williams, "I'm done here. I'm gonna get my phone." Williams responded, "f*** you, you ain't going nowhere." Williams then followed Smetana and cornered him by the doors to the ballroom. Smetana returned to the desk.

¶ 15       Williams called the police using his cell phone. Smetana moved closer so he could overhear. Williams was stating that Smetana had touched him and would not stop. Smetana protested that he had not touched Williams, but rather, Williams had been putting his hands on him. Smetana returned to the desk and leaned on it. He turned to find Williams standing close by. Smetana pointed to the door and told Williams to wait outside for the police. Williams then made a fist and jabbed his forearm into Smetana's chest and Adam's apple.

¶ 16       Smetana felt the wind had been knocked out of him and was pushed back into the desk. He bounced off the desk and pushed Williams back. A pushing match ensued. Smetana felt his safety was threatened. Williams was reaching toward his left pocket or belt and Smetana heard Williams say under his breath, "I'm going to f*** you up." Smetana then decided to hit Williams.

¶ 17       Smetana denied that he charged Williams. Rather, he was arguing about being hit when Williams deployed pepper spray. Smetana was in pain. He went to the ground and struggled to breathe. As he attempted to stand, Williams said, "stay the f*** down or I'll f***ing shoot you!" Smetana laid down. He believed that Williams would continue to attack him. Smetana could not see clearly but lunged at Williams to take him down and disarm him. They went to the ground and exchanged blows. Smetana felt someone pull him away, but he did not know who. He spun to free

himself and hit the person, but stopped when he realized it was Korneta. Moments later, Smetana felt the effects of a second pepper spray.

¶ 18     Smetana insisted that he did not strike Williams until Williams had shoved him into the desk and he hit Williams because he felt it was necessary to do so.

¶ 19     After closing arguments, the court found Smetana guilty of battery. In announcing its finding, the court noted that it found both Williams and Korneta credible and neither was evasive in their responses to questioning from either party. The court explained further that the circumstances of Williams being called to the front desk and attempting to obtain information from Smetana upon his arrival made it clear that Williams was an employee of the club and acting in that capacity to respond to the incident in the ballroom. The court also observed that Smetana's testimony that he attempted to explain to Williams what had occurred in the ballroom showed that he understood Williams to be a club employee. In addition, the court noted that the video corroborated witness testimony that Smetana exhibited aggressive behavior. Smetana, the court explained, based his self-defense claim on Williams's action of raising his arm. But the court found that Williams did so "only after [Smetana] continued to pursue after [Williams and] refused the directions to back up away *** [Smetana] was instructed to back up and repeatedly [he] failed to comply with those requests."

¶ 20     The court sentenced Smetana to twelve months of supervision with conditions to continue psychotherapy and complete 75 hours of community service. Smetana filed a timely notice of appeal.

¶ 21                                    II. ANALYSIS

¶ 22     Smetana argues that the State failed to prove that he had not acted in self-defense and his conviction should be reversed. When a defendant challenges the sufficiency of the evidence to

disprove their self-defense claim, the question on our review is whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense. *People v. Brown*, 406 Ill. App. 3d 1068, 1081 (2011).

¶ 23     The elements of self-defense are: (1) unlawful force was threated against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable. *People v. Freneey*, 2016 IL App (1st) 140328, ¶ 30. If the State negates any one of these elements, the defendant's claim fails. *Id.*

¶ 24     Among other arguments, Smetana asserts that he was not the aggressor since he did not strike or shove Williams before Williams raised his arm, pushing Smetana toward the desk. This court has observed, however, that "the first person to resort to physical force is often but not *always* deemed the aggressor." (Emphasis in original.) *People v. Cruz*, 2021 IL App (1st) 190132, ¶ 48. "A person may be the 'initial aggressor' in a conflict if *** he 'initially provoke[d] the use of force against himself.' " *Id.* (quoting Illinois Pattern Jury Instructions, Criminal, No. 24-25.09 (4th ed. 2000)).

¶ 25     The trial court's comments indicate that it found Smetana had provoked Williams to raise his arm by continuing to follow him in an aggressive manner and by disregarding Williams's requests to back up. Thus, the court found that Smetana was the initial aggressor. On this factual question, we give deference to the trial court as the trier of fact. *Id.* ¶ 44.

¶ 26     "In a bench trial, the trial court determines the credibility of witnesses, weighs the evidence, resolves conflicts in the evidence, and draws reasonable inferences from the evidence." *Freneey*,

2016 IL App (1st) 140328, ¶ 18. We will not substitute our judgment on these matters. *Id.* Further, we will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id.*

¶ 27        Here, the court could reasonably find that Smetana was the initial aggressor. We have viewed the video of the incident, and find it accords more with Williams's and Korneta's accounts than Smetana's. It depicts Smetana appearing to shout and gesticulate while he repeatedly follows and bumps into Williams. The court found that Williams's testimony was credible. Williams stated that Smetana was acting aggressively and attempting to provoke him. Viewing this evidence in the light most favorable to the State, as we must, a rational fact finder could conclude that Smetana was the aggressor. Consequently, the State negated Smetana's claim of self-defense.

¶ 28        In addition, we observe that the video supports that Smetana's reaction to Williams's push was not defensive, but retaliatory and disproportionate. "[I]f the defendant responds to a confrontation with such excessive force that he is no longer acting in self-defense but in retaliation, the excessive use of force renders the defendant the aggressor, even if the other person involved actually commenced the confrontation." *People v. Guja*, 2016 IL App (1st) 140046, ¶ 52. After pushing Smetana, Williams began backing away. Smetana then pushed Williams and began throwing punches. Williams raised his arms but did not strike back. Williams then turned and walked away. Smetana went after him and struck Williams in the back of the head multiple times.

¶ 29        Further, Smetana attacked Williams a second time when Williams was clearly no threat to him. After being pepper sprayed, Smetana laid face down on the floor for more than a minute. Williams remained some distance away. Smetana rose to his feet and ran at Williams, knocking him down. Smetana then stood over Williams and pummeled him as he lay on the ground.

Regardless of whether Smetana's previous actions were defensive, the second attack was not and would support a battery conviction by itself.

¶ 30 Allowing all reasonable inferences from the record in favor of the State, as we must (*People v. Eubanks*, 2019 IL 123525, ¶ 95), we conclude that a rational trier of fact could have found beyond a reasonable doubt that Smetana did not act in self-defense when he was the aggressor.

¶ 31                                   III. CONCLUSION

¶ 32 For these reasons, we affirm the judgment of the circuit court.

¶ 33 Affirmed.